UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BRADLEY DEREK BENNETT,

      Plaintiff,

v.                                   Case No.  3:19-cv-1158-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an

administrative decision denying his applications for a period of disability,

disability insurance benefits ("DIB"), and supplemental security income

("SSI").  Following an administrative hearing held via video on October 25,

2018, the assigned Administrative Law Judge ("ALJ") issued a decision,

finding Plaintiff not disabled from December 24, 2014[2] through December 24,

---

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge.  (Doc. 14.)

[2] Although in both of his applications Plaintiff alleged disability beginning
December 31, 2010 (Tr. 215, 217), the ALJ found that the time period at issue in
this case began on December 24, 2014, because Plaintiff's prior application was
denied initially on August 28, 2014 and upon reconsideration on December 23, 2014,
there were no grounds for reopening the determination on the prior application, and
the doctrine of *res judicata* precluded consideration of the issue of disability before
December 23, 2014 (Tr. 15-16).

2018, the date of the ALJ's decision.[3]  (Tr. 15-29, 34-69.)  Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

## I.   Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a

---

[3] Plaintiff had to establish disability on or before December 31, 2015, his date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 16.)  The relevant period for his SSI application is the month in which the application was filed (March 2016) through the date of the ALJ's decision (December 24, 2018).  (Tr. 15.)

whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.   Discussion

Plaintiff argues that the ALJ's residual functional capacity ("RFC") assessment and hypothetical questions to the vocational expert ("VE") failed to account for all work-related limitations associated with Plaintiff's severe impairments of schizoaffective disorder and social phobia, such as the inability to leave his house or his room, the inability to focus as a result of auditory hallucinations, and the experience of fatigue/drowsiness as a side effect from medication. (Doc. 18 at 13-14.) Plaintiff also argues that the ALJ improperly discounted the treating opinions of Dr. Larson and the examining opinions of Drs. Milne and Knox related to Plaintiff's severe impairments. (*Id.* at 18-19.) Plaintiff points out that all three doctors are specialists in the field of psychology and are the only medical professionals who have offered medical opinions based on an actual examination. (*Id.* at 19.) Plaintiff also points out that the ALJ discussed these doctors' opinions in isolation and failed to acknowledge, much less discuss, the consistency among them. (*Id.* at 20.) As for the State Agency non-examining consultants' opinions, which

were given the most weight compared to any other medical opinion of record, Plaintiff asserts that the ALJ failed to include the limitation to two-to-three-step oral instructions and the limitation to work with supportive, communicative supervisors and caring support staff in the RFC assessment, or explain why such limitations were not accepted.  (*Id.* at 23-24.)

Defendant responds that "[s]ubstantial evidence supports the ALJ's RFC finding based on Plaintiff's improvement with treatment, mild mental status examination findings, his daily activities, and the opinions of the [S]tate [A]gency psychological consultants."  (Doc. 22 at 6.)  Defendant argues that a remand is not necessary because "the ALJ did not fail to include relevant limitations in the RFC finding and properly evaluated the medical opinion evidence."  (*Id.* at 8.)

## A.  Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6),  416.927(c)(2)-(6). "However, the ALJ is not required to explicitly address each of those factors. Rather, the ALJ must provide 'good cause' for rejecting a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, Case No. 8:06-cv-1863-T-27TGW, 2008 WL

649244, *3 (M.D. Fla. Mar. 10, 2008).  Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding."  *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining [S]tate [A]gency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'"  *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[4] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources).  While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision.  SSR 96-6p.

### B.    Relevant Opinion Evidence

### 1.    Treating Source Opinions

On April 25, 2017, James L. Larson, M.D., Medical Director at Clay Behavioral Health Center, authored a letter regarding Plaintiff's

---

[4] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017.  However, because Plaintiff's applications predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

impairments and limitations.  (Tr. 497.)  The letter stated that Plaintiff had

Schizophrenia, Paranoid type; he was taking Aripiprazole and complained

that he was "tired all the time."  (*Id.*)  The letter also stated:

> If we reduce the Aripiprazole at all[,] the auditory hallucinations
> come back.  He wants Adderall (amphetamine salts) to help, but
> this will probably make his auditory hallucinations and paranoia
> worse.
>
> He is not able to understand and carry out short[,] simple
> instructions and to decrease his Aripiprazole will probably lead to
> a psychotic break with hospitalization and continued disability.
> He needs to be on disability and have Medicare to help with
> taking care of him and his family.  He is not able to work.

(*Id.*)

On October 17, 2018, Dr. Larson authored a Medical Source Statement

("MSS"), which reaffirmed Plaintiff's diagnosis of Schizophrenia, Paranoid

type, and further stated:

> On April 25, 2017, I provided a short letter of assessment.  The
> limitations I placed continue to be present and[,] in my opinion,
> they reasonably began with the date of his Baker Act on
> November 19, 2015.  I have treated Mr. Bennett on a consistent
> basis since December 29, 2015 and my opinion is based upon my
> clinical examinations, my interviews with Mr. Bennett and my
> observations of the symptoms that have been present on a
> consistent basis since December 2015[.]

(Tr. 512.)

### 2.    Examining Source Opinions

### a.    Robin M. Johnson, Psy.D.

On July 8, 2014, Dr. Johnson, a licensed psychologist, examined

7

Plaintiff at the request of the Office of Disability Determination.  (Tr. 336-39.)  Plaintiff and his wife were transported to Dr. Johnson's office by Plaintiff's mother.  (Tr. 336.)  Plaintiff stated that they had been residing with his parents for the last four years and he was disabled due to anxiety and social phobia.  (*Id*.)  According to his wife and mother, Plaintiff isolated himself in his room for days at a time.  (Tr. 338.)

Plaintiff described his mood as sad.  (*Id*.)  His thought processes were delayed, and his affect was flat and restricted.  (*Id*.)  The mental status examination also showed the following abnormal findings:

**Concentration/Attention:**  Mr. Bennett was unable to perform serial 7's.  His forward spelling of *world* had to be corrected and he incorrectly spelled *world* backward (DLOW).  There were mild impairments in his concentration and attention.

. . .

**Recent and Remote Memory:**  Mr. Bennett recalled . . . two out of three words after a brief delay.  . . .  He was unable to recall a current news event; expressing "I don't watch the news….I don't like hearing about kids going missing."  . . .

**Hallucinations and Perceptual Disturbances:**  Mr. Bennett acknowledged hearing people talking negatively about him and verbalized mild paranoid thoughts that others are spying on him.  There were no observable indications of a psychotic nature.

**Behavioral Observations:** . . .  He maintained fair eye contact.  . . . His thought processes were linear and goal directed, but delayed.  . . .  His cognitive functioning appeared to be in the low average range.  . . .

**Daily Functioning:**  Mr. Bennett reports spending his day

watching television or working out in the garage.  He attends to
his hygiene needs, but his wife has to get on him to take a
shower.  He expressed not seeing the need to shower if he isn't
going anywhere. . . .  He is capable of cooking and performing
house[-]hold chores, but expressed he hasn't done either in a long
time.  He is capable of shopping, but stated that he hasn't been in
a grocery store in eight years or in a restaurant in 12 years.  He
drives and has a valid Florida driver's license.  He enjoys riding
dirt bikes with his sons in the woods and verbalized he feels safe
in the woods away from others.  He has limited socialization,
except for his family.

(*Id.* (emphasis in original).)

Dr. Johnson diagnosed Plaintiff with, *inter alia*, major depressive
disorder ("MDD"), recurrent, moderate, by history; attention deficit
hyperactivity disorder ("ADHD"), inattentive type, by history; generalized
anxiety disorder ("GAD"), by history; and assigned a Global Assessment of
Functioning ("GAF") score of 60.  (Tr. 338-39.)  Dr. Johnson's prognosis was
guarded.  (Tr. 339.)  She noted that Plaintiff's "symptoms would likely
improve with individual counseling," but group counseling was "likely to be
ineffective due to his anxiety when around others."  (*Id.*)  With respect to
Plaintiff's vocational functional ability, Dr. Johnson opined as follows:

Mr. Bennett retains the ability to understand and remember
complex tasks independently.  His ability to perform tasks is
moderately impaired by his affective symptomatology[,] primarily
depression.  His ability to sustain attention and concentration for
any extended period of time is likely moderately impaired by his
affective symptomatology and ADHD symptoms.  His ability to
interact appropriately with others is moderately impaired by his
affective symptomatology.  His ability to adhere to a work
schedule and adjust and adapt to workplace changes, at this

9

time, appears to be moderately to significantly impaired by his affective symptomatology.

(*Id.*)

### b.      Stephanie Milne, Psy.D., BCB

On May 20, 2016, Dr. Milne, a licensed psychologist, examined Plaintiff at the request of the Division of Disability Determination.[5]  (Tr. 447-50.) Plaintiff's mother was also present at the evaluation.  (Tr. 447.)  Plaintiff stated that he was disabled due to schizophrenia, social disorder, and antipsychotic disorder.  (*Id.*)  Dr. Milne recorded the following history:

> Mr. Bennett stated that he started hearing voices approximately 3 years ago.  His depression started after his brother died in 2002.  His symptoms of depression are sadness and isolation.  He has always had anxiety[,] but his symptoms have become worse over the years. . . .  Mr. Bennett has been in and out of therapy since he was 8 years old. . . .  He has received inpatient treatment for mental illness.  He was last "Baker [A]cted" at the end of 2015.  He stayed in the hospital for 5 days.  Mr. Bennett requires reminders and assistance with his daily living skills.  He does not like to shower because he believes there are video cameras in the shower.  Socially, he isolates in his room in the dark and will only go into the garage at night to work on his cars. Mr. Bennett has difficulty completing tasks on time.  His symptoms are worse when he is not on his medication and at night.

(*Id.*)

Dr. Milne observed that Plaintiff was unshaven and appeared

---

[5] Dr. Milne's opinions were based on her clinical interview with Plaintiff, review of records provided by the Division of Disability Determination, and Mini-Mental State Examination ("MMSE") findings.  (Tr. 448.)

overweight, his motor activity and cognitive processing were very slow/retarded, his speech was slow, his attitude was guarded, and his mood and affect were blunted.  (Tr. 448-49.)  She stated that Plaintiff "hears voices" and his "speaking is delayed and sparse at times."  (Tr. 449.)  As to Plaintiff's cognition, Dr. Milne noted as follows:

> Mr. Bennett's orientation was intact. . . .  Intelligence was below average.  Attention and concentration was intact.  He was unable to spell the word "world" backwards. . . .  He was unable to repeat five digits backward on both trials.  Thought content contained delusions.  Perception contained auditory hallucinations.  Judgment was impaired.  Insight was good. . . . Memory was impaired for remote and recent memory [sic].

(*Id.*)  Plaintiff's score on the MMSE suggested no cognitive impairment.  (*Id.*)

Further, Dr. Milne reported that Plaintiff had "difficulty" with work-related mental activities, memory, concentration, and persistence, but had no difficulty with traveling and he did not travel.  (Tr. 449-50.)  She noted that "Mr. Bennett isolate[d] [himself] in his room in the dark and [would] only go into the garage at night to work on his cars," and was not capable of managing his own funds.  (Tr. 450.)  Dr. Milne diagnosed Plaintiff with schizoaffective disorder, depressive type, and unspecified neurocognitive disorder; assigned a GAF score of 50; and noted that Plaintiff's prognosis was poor.  (*Id.*)

Under "Summary and Recommendations," Dr. Milne stated as follows:

Bradley Derek Bennett is a 35[-]year[-]old male seeking disability

due to "schizophrenia, social disorder and antipsychotic disorder." Based on his presentation during the interview, and information obtained from his mother who [was] present, it is believed that Mr. Bennett meets the diagnostic criteria for Schizoaffective Disorder, Depressive Type (DSM 5: F25.1). He is also being given the rule-out of Unspecified Neurocognitive Disorder (DSM 5: R41.9) for further assessment. Mr. Bennett may benefit from continued individual therapy and psychiatric medication management. He may also benefit from a complete neuropsychological evaluation and neurological evaluation to determine if there is another organic cause for his symptoms.

(*Id.*)

### c.   Peter Knox, M.Ed., Psy.D.

On October 3, 2016, Dr. Knox, a licensed psychologist, examined Plaintiff at the request of the Division of Disability Determination.[6] (Tr. 474.) Plaintiff reported disability due to social phobia and hearing voices. (*Id.*) Dr. Knox observed that Plaintiff's mood appeared dysphoric; he had a flat affect; he could relate information in a slow, but rational, coherent, and sequential fashion; and he did not appear to be reacting to internal disturbances despite his reports of hearing negative voices. (Tr. 476-77.) Further, "Mr. Bennett answered questions in a matter of fact way" and "[t]here were no behavioral indications of anxiety or thought disorder at the time of the interview." (Tr. 477.) Dr. Knox stated that Plaintiff was

---

[6] Dr. Knox's findings were based on Plaintiff's and his mother's reports, a mental status examination of Plaintiff, and treatment notes from the Center for a Healthy Mind and Wellbeing. (Tr. 474-78.)

incapable of managing his own funds.  (*Id.*)

Dr. Knox opined that there was no significant impairment in work-related mental activities.  (*Id.*)  With respect to Plaintiff's social interaction and adaptation, Dr. Knox noted:

> Mr. Bennett stated that in a day he will sit in his room and do nothing.  Mr. Bennett noted he hears negative voices in his room[,] like he is not going to amount to anything in life.  Mr. Bennett can clean up after himself and he will do laundry and he can make his own meals.

(Tr. 478.)

Under "Diagnosis Summary," Dr. Knox wrote:

> Mr. Bennett's mother was interviewed later and she explained she started to see issues with her son in the 7th grade as, "he had the social anxiety and he would make himself sick so he would not have to go to school, so he would throw up.  I tried to home school him and he was fine as long as I was besides [sic] him and he had A.D.H.D. as a child."  Mr. Bennett's condition is seen as a Social Anxiety[.]

> Mr. Bennett is seen, from the information provided to have a Major Depression with Psychosis with this starting in 2002 when his brother died and since then he has shown symptoms of the depression with him isolating in his room.

(*Id.*)  Dr. Knox diagnosed, *inter alia*, major depression with psychosis, social phobia, and a GAF score of 40.  (*Id.*)  Plaintiff's prognosis was noted to be poor.  (*Id.*)

### 3.   State Agency Non-Examining Source Opinions

#### a.   Madelyn Miranda-DeCollibus, Psy.D.

On May 31, 2016, after reviewing the records available as of that date, Dr. Miranda-DeCollibus completed a Psychiatric Review Technique ("PRT"), opining that Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in social functioning and in concentration, persistence, or pace.  (Tr. 76.)  Dr. Miranda-DeCollibus explained that moderate limitations in social/adaptive functioning and in concentration, persistence, or pace could be reasonably expected due to symptoms of schizoaffective disorder.  (Tr. 76-77.)

On May 31, 2016, Dr. Miranda-DeCollibus also completed a Mental RFC Assessment.  (Tr. 79-81.)  She opined, *inter alia*, that Plaintiff had marked limitations in interacting appropriately with the general public; and moderate limitations in: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers; and responding appropriately to changes in the work setting.  (Tr. 79-80.)  Dr. Miranda-DeCollibus explained:

> Although deficits can be expected due to schizoaffective disorder, the data suggests that the claimant appears capable of following routine, simple and repetitive tasks.  The claimant appears to be able to perform simple, daily activities.  Clear, concise, systematic instructions and repetitive tasks would be most helpful along

with a caring support staff.

Although deficits can be expected due to aforementioned [medically determinable impairments], the consensus of the data suggests that the claimant appears capable of performing simple, repetitive tasks with a basic understanding and adequate persistence in setting with limited social contact. In addition, the claimant should be capable of attention and concentration for at least 2 hours at a time, and would require reasonable, but not frequent breaks throughout the day. The claimant is able to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances.

As a result of the experience of anxiety and/or paranoid beliefs, the claimant is not suitable for work with the general public. He may have moderate difficulties interacting appropriately with peers, asking questions, and accepting instructions and criticism from supervisors. However, the claimant should be able to maintain socially appropriate behavior and adhere to basic standards of neatness. The claimant should be able to sustain average performance and maintain a more steady [sic] balance of emotion including anxiety management with a supportive, communicative supervisor, clear, attainable performance goals, and a more isolated performance environment.

The claimant may have difficulty coping with the stress of rapid changes in the performance environment secondary to concentration deficits and anxiety, and thus, the claimant may prefer repetitive tasks that do not require alteration in routine. However, the claimant should be able to adhere to simple precautions and exercise adequate judgment with respect to independent planning.

SUMMARY: The claimant retains the ability to mentally perform at the level cited and discussed in this MRFC. Claimant can be expected to perform simple and repetitive tasks in a limited work environment and to meet the basic mental demands of work on a sustained basis despite any limitations resulting from identified [medically determinable impairments].

(Tr. 81.)

### b.    Kevin Ragsdale, Ph.D.

On October 10, 2016, Dr. Ragsdale completed a PRT, opining that there was "insufficient medical and functional evidence to evaluate the severity of [claimant's] mental [medically determinable impairments] between [the alleged onset of disability] and [the date last insured]." (Tr. 112.)  In another PRT from the same day, Dr. Ragsdale determined that Plaintiff had moderate difficulties in social functioning and in concentration, persistence, or pace.  (Tr. 121.)  He explained:

> After thoroughly reviewing the case file, I do not find that the evidence supports the presence of mental impairments that impose listing level limitations.  The treatment records and [m]ental [consultative evaluations] do not fully support the level of symptomatology and dysfunction described by cl[aimant].  So the mental allegations are assessed as partially consistent with the objective evidence.  Overall, while the established [medically determinable impairments] do appear to [be] more than minimally limiting, the case record shows cl[aimant] remains sufficiently capable of executing basic, routine activities of daily living independently, interacting/communicating with others appropriately for discrete periods of time, and sustaining a level of concentration/persistence sufficient for completing ordinary life tasks.

(Tr. 122.)

In a Mental RFC completed on October 10, 2016, Dr. Ragsdale opined that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions.  (Tr. 123-24.)  He explained:

> Cl[aimant] may struggle to grasp/retain the concepts, vocabulary, procedures, systems, etc. typically associated with academic and

> technologically-sophisticated occupations.  Nevertheless, the
> available evidence supports that, at a minimum, cl[aimant] has
> the cognitive ability to understand/remember 2-3 step oral
> instructions, learn basic, job-specific terminology, and follow a
> routinized, formulaic work process after a normal, [on-the-job]
> training period.

(Tr. 123.)

Further, Plaintiff was moderately limited in the ability to maintain

attention and concentration for extended periods, work in coordination with

or in proximity to others, and complete a normal workday and workweek

without interruptions from psychologically-based symptoms and perform at a

consistent pace without an unreasonable number and length of rest periods.

(Tr. 124.)  Dr. Ragsdale stated:

> Even though cl[aimant] could have some trouble executing
> complicated, multistep instructions accurately and efficiently, he
> has the capacity to complete largely solitary, unskilled job
> assignments consisting of recurrent, uniform steps at an
> acceptable, consistent pace and remain sufficiently attentive/on
> task while doing so without the need for excessive breaks or
> specialized supervision.

(*Id.*)

Dr. Ragsdale also found that Plaintiff was moderately limited in the

ability to interact appropriately with the general public, to accept

instructions and respond appropriately to criticism from supervisors, and to

get along with coworkers or peers.  (*Id.*)  He stated:

> Cl[aimant] could find [it] difficult to succeed in positions
> emphasizing interpersonal communication and social adroitness.

17

> But despite these limitations, he appears capable of displaying an
> acceptable level of propriety during brief, routine job-related
> interpersonal interactions and abide by the general precepts set
> forth by employers governing workplace decorum and personal
> appearance.

(Tr. 124-25.)

Plaintiff was also found to be moderately limited in the ability to

respond appropriately to changes in the work setting as follows:

> Cl[aimant] is capable of responding appropriately to standard
> modifications in vocational duties such as schedule changes,
> following occupational safety guidelines, securing transportation
> to a jobsite, and demonstrating an acceptable level of autonomy
> in employment-related activities.  However, he may struggle to
> adjust quickly/appropriately to abrupt, significant changes in the
> typical work routine and/or employer P&P.

(Tr. 125.)  In conclusion, Dr. Ragsdale explained:

> The limitations noted here account for those that are reasonably
> supported by the relevant medical findings in the case record.
> Notwithstanding the statements declaring/implying additional
> and/or more severe mental restrictions, the totality of the
> objective evidence indicates that from an exclusively mental point
> of view, [claimant's] [RFC] remains sufficient for the performance
> of [full time] basic work activity.

(*Id.*)

## C.    The ALJ's Decision

The ALJ found at step two of the sequential evaluation process[7] that

Plaintiff's schizoaffective disorder and social phobia were "severe

---

[7] The Commissioner employs a five-step process in determining disability.
*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

impairments." (Tr. 18.)  Further, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following limitations:

> [N]o climbing ladders, ropes[,] and scaffolds; and no exposure to obvious hazards.  The claimant can also: understand, carry out and remember simple instructions where the work is not fast paced, meaning no work where the pace of productivity is dictated by an external source over which the claimant has no control such as an assembly line or conveyor belt; make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes; and respond appropriately to occasional contact with supervisory personnel, no contact with the general public, and rare (meaning less than occasional but not completely precluded) contact with coworkers where there is no working in team or tandem with coworkers.

(Tr. 20-21.)  In making this finding, the ALJ discussed Plaintiff's testimony, his wife's statements, the objective medical evidence, and the opinion evidence of record.  (Tr. 21-26.)

After addressing the medical evidence, the ALJ gave "partial weight" to the State Agency non-examining psychologists' opinions.  (Tr. 24.)  The ALJ explained:

> While some of the limitations they suggested are overly specific and not stated in vocational terms, they ultimately found no more than moderate impairment overall, and this is generally supported by the preponderance of the objective evidence, including evidence submitted after their assessments.  The [ALJ] has essentially adopted their overall assessment but has translated the limitations to the range of simple, low stress work described above.  Further, for the reasons discussed in Finding

Number 4 above, the undersigned finds marked impairment in social functioning and has therefore precluded the claimant from public contact and provided additional limitations for occasional contact with supervisors and rare (as defined above) contact with coworkers.  The undersigned has also included hazard limitations to further accommodate the claimant's reported hallucinations, although he has not been observed as responding to internal stimuli.

(*Id.*)

Next, the ALJ gave "little weight" to the examining psychologists'

opinions because:

Each [of them] evaluated the claimant on just one occasion.  As indicated above, these sources did not provide any specific opinions for several of the areas of functioning.  Further, in the areas they did provide an opinion, their opinions are vague; for example, Dr. Milne opined the claimant had "difficulty" with work-related mental activities, memory, concentration, and persistence, but she did not provide any specific functional limitations in this regard.

(*Id.*)

The ALJ then addressed Dr. Larson's opinions and gave them "little

weight." (Tr. 25.)  The ALJ stated that Dr. Larson's opinions were "not

entitled to controlling or deferential weight under the Regulations, because

[they were] not well supported by medically acceptable clinical findings in the

record and [were] inconsistent with other substantial medical evidence of

record."  (*Id.*)  The ALJ further stated:

Although Dr. Larson has been the claimant's treating psychiatrist, his opinion is unsupported by his own treatment notes.  As discussed above, these records generally show

20

improvement with treatment.  Mental status examinations
generally show only some dysphoric moods and a blunted affect,
with complaints of hallucinations on some occasions.  On other
occasions, he documented euthymic mood, a broad-ranged affect,
normal motor behavior, a cooperative attitude and behavior, an
appropriate appearance, normal speech, and intact cognition
(Exhibits 7F, 9F, 11F).  The limitations in the [RFC] above for
simple, low stress work with limited social contacts and no
contact with the general public adequately account for these
findings.  Further, Dr. Larson's opinion in these letters is
inconsistent with the GAF scores he estimated in his notes; the
scores discussed above indicate only moderate symptomatology.

(*Id.*)

The ALJ also addressed the GAF scores in the record as follows:

Some of the claimant's GAF scores in the record are at 50 or
below (see, for example, Exhibits 5F, page 19; 7F, page 7; 8F,
page 6).  However, the global assessment of functioning is only a
subjective estimate by a clinician of the claimant's status in the
preceding two weeks, and these scores were provided upon the
claimant's initial presentation and admission to treatment,
and/or prior to being prescribed psychiatric medication.  Notably,
when Dr. Knox performed a consultative psychological evaluation
in October 2016, he estimated a GAF score of 40, but this is
inconsistent with his opinion that the claimant experienced no
significant issues in any of the major functional areas (Exhibit
8F, pages 5-6).  The [ALJ] finds that the consistency of the higher
GAF scores in the record and the preponderance of the
examination findings from the claimant's treating and examining
sources supports a reasonable inference that the claimant
experiences the range of functioning described above.  Thus, the
[ALJ] gives little weight to the GAF score estimated by Dr. Knox
and the other low GAF scores in the record.  The higher scores
discussed above, however, despite their limited relevancy, are
generally consistent with the preponderance of the mental health
records and are given some weight.

(Tr. 25-26.)

The ALJ also discussed Plaintiff's wife's statements and gave them "little weight" for the following reasons:

> Ms. Bennett is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, and thus the accuracy of her statements is questionable. Moreover, by virtue of the relationship as the claimant's wife, she cannot be considered a disinterested third party whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Most importantly, significant weight cannot be given to Ms. Bennett's assessment because it, like the claimant's [testimony], is simply not consistent with the preponderance of the objective evidence.

(Tr. 26.)

Then, at step four, the ALJ determined that Plaintiff was unable to perform any of his past relevant work. (*Id.*) However, at the fifth and final step of the sequential evaluation, the ALJ determined, after considering Plaintiff's age, education, work experience, RFC, and the testimony of the VE, that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, such as an automotive detailer, a janitorial worker, and an order puller. (Tr. 27-28.) All of these representative occupations are medium exertion, unskilled, with a Specific Vocational Preparation ("SVP") of 2. (Tr. 28.)

### D.   Analysis

The Court agrees with Plaintiff that the ALJ's RFC assessment is not

supported by substantial evidence.  The ALJ gave "little weight" to the treating and examining doctors' opinions, while according "partial weight" to the State Agency non-examining consultants' opinions.  (Tr. 24-26.)  The ALJ "essentially adopted the[] overall assessment[s]" of the State Agency psychologists who never examined Plaintiff, yet issued "overly specific" limitations; at the same time, the ALJ discounted the opinions of the examining consultants who saw Plaintiff, albeit "on just one occasion," but "did not provide any specific opinions for several of the areas of functioning." (*Id.*)  The Court agrees with Plaintiff that although the ALJ could consider, as one reason for discounting the examining doctors' opinions that they saw Plaintiff only once, here the ALJ gave more weight to the opinions of consultants who *never* examined Plaintiff rather than to those who saw him more regularly than the one-time examining doctors.

The ALJ also discounted the opinions of the examining psychologists because they "did not provide any specific opinions for several of the areas of functioning" and for the areas that they did provide an opinion, their opinions were "vague."  (Tr. 24.)  As an example, the ALJ cited Dr. Milne's opinion that Plaintiff had difficulty with work-related mental activities, memory, concentration, and persistence.  (*Id.*)

While Dr. Milne opined that Plaintiff had difficulty with work-related mental activities, memory, concentration, and persistence (Tr. 449-50), her

report also included other details about Plaintiff's impairments and functioning.  For example, Dr. Milne noted that Plaintiff "isolate[d] in his room in the dark and [would] only go into the garage at night to work on his cars," he was not capable of managing his own funds, his motor activity and cognitive processing were very slow/retarded, his speech was slow and sparse at times, his mood and affect were blunted, his attitude was guarded, his judgment and memory were impaired, and he had auditory hallucinations and delusions.  (Tr. 448-50.)

Even if Dr. Milne's opinion was vague as the ALJ determined, Dr. Milne was only one out of three examining psychologists who saw Plaintiff at the request of the Office of Disability Determination and issued an opinion about Plaintiff's impairments and functional limitations.  The other two examining consultants issued similar reports.  For example, Dr. Knox similarly observed that Plaintiff's speech was slow, his affect was flat, his mood was dysphoric, he was not capable of managing his own funds, he was isolating in his room, and he had auditory hallucinations.  (Tr. 476-78.)  In addition, Dr. Johnson noted that Plaintiff's thought processes were delayed; his affect was flat and restricted; his mood was sad; his ability to perform tasks, to interact appropriately with others, and to sustain attention and concentration for any extended period of time was moderately impaired; his ability to adhere to a work schedule and to adjust to workplace changes was

moderately to significantly impaired; he was isolating in his room for days at a time and had not been to a grocery store for eight years and to a restaurant for twelve years; and he had auditory hallucinations and paranoid thoughts. (Tr. 338-39; *see also* Tr. 339 (noting that due to Plaintiff's anxiety when around other people, group counseling was likely to be ineffective).)  Notably, Plaintiff was accompanied and/or transported to these consultative examinations either by his mother or his wife, or both.  (Tr. 336, 447, 474.) Further, both Dr. Milne and Dr. Knox opined that Plaintiff's prognosis was poor and assigned a GAF score of 40 or 50.  (Tr. 450, 478; *cf.* Tr. 338-39 (noting a GAF score of 60 and a guarded prognosis by Dr. Johnson).)

As Plaintiff submits, the opinions of the examining consultants do not seem inconsistent with each other and do not seem to portray an individual who is able to perform "work activity on a regular and continuing basis."  20 C.F.R. §§ 404.1545(c), 416.945(c); *see also* SSR 96-8p ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

Importantly, the medical records tend to corroborate the statements by Plaintiff's family members that he was isolating in his room and would leave

the house only infrequently,[8] accompanied by family members, to attend his

doctor's appointments.  (*See* Tr. 46 & 48 (testifying at the administrative

hearing that due to his social anxiety, Plaintiff does not leave his house even

for grocery shopping, but sometimes may pick up his children from school);

Tr. 59 (stating that Plaintiff comes out of his room for 30 minutes at most and

does not play with his children); Tr. 241 (stating that Plaintiff does not go out

in public alone because he does not "feel secure without [his] wife or kids");

Tr. 242 (stating that Plaintiff needs his wife or mother to accompany him to

doctor's appointments); Tr. 336 ("[Plaintiff] and his wife were transported to

the office by his mother."); Tr. 338 ("According to his wife and mother,

[Plaintiff] isolates himself in his room for days at a time."); Tr. 415 (noting, as

of November 20, 2014, that Plaintiff remained isolated at his home and was

unable to work because of severe social anxiety); Tr. 412 (noting, as of

January 15, 2015, that Plaintiff remained isolated at his home); Tr. 458

(reporting, on December 29, 2015, that Plaintiff had "extremely severe social

anxiety and paranoia," which prevented him from working and spending time

with his family, and that he had not been to a restaurant for about ten years);

Tr. 447 (noting that Plaintiff was accompanied by his mother at the May 20,

2016 evaluation); Tr. 476 & 478 (noting, as of October 3, 2016, that Plaintiff

---

[8] Plaintiff saw his treating provider, Dr. Larson, every few months.  (*See* Tr. 453-54, 468.)

was not able to go out in public).)

The ALJ's RFC assessment does not seem to take into account either Plaintiff's social isolation and apparent inability to leave his home independently, or his continued, albeit improved, hallucinations. (*See* Tr. 46-47 ("I hear voices all the time. . . . They just put me down, sometimes they'll tell me to kill myself. . . . [I]t was a lot worse before I got on the medicine. But I still hear the voices."); Tr. 439-43 (noting that Plaintiff was admitted for inpatient psychiatric treatment on November 16, 2015 for, *inter alia*, auditory hallucinations, social phobia, paranoia, and substance-induced psychosis); Tr. 465 & 467-68 (noting, as of December 29, 2015, that Plaintiff had "an extreme fear of being in a crowded place" and auditory hallucinations that prevented him "from functioning in major areas of his life, including work and parenting"); Tr. 457 (noting, as of January 22, 2016, that Plaintiff had hallucinations, delusions, etc., and a GAF score of 20-30); Tr. 453 (noting, as of April 5, 2016, hallucinations, among other symptoms); Tr. 449-50 (noting, as of May 20, 2016, auditory hallucinations and home isolation); Tr. 474 & 478 (noting, as of October 3, 2016, continuing auditory hallucinations); Tr. 500 (noting, as of August 11, 2017, that Plaintiff had auditory hallucinations at night, among other symptoms); Tr. 499 (noting, as of March 7, 2018, intermittent hallucinations at night, among other symptoms); Tr. 498 (noting, as of July 14, 2018, intermittent auditory hallucinations, among

other symptoms).)  Without the ability to navigate outside his house independently, it is unclear how Plaintiff could perform any type of work on a regular and continuing basis.  While the ALJ included hazard limitations in the RFC assessment to accommodate Plaintiff's hallucinations, the record reflects that the hallucinations and the prescribed treatment actually affected Plaintiff's energy, focus/concentration, and memory.  (*See, e.g.*, Tr. 51 ("Abilify makes me real slow, sluggish.  I can't remember a lot."); Tr. 58 (stating that Plaintiff is "always in bed" as he is "always tired"); Tr. 497 (noting that the prescribed medication made Plaintiff "tired all the time" and a reduction or change of his medication would cause worsening of his auditory hallucinations).)

Further, the ALJ's evaluation of Dr. Larson's opinions does not seem to be supported by substantial evidence.  The records of Dr. Larson and Clay Behavioral Health Center show more than just "some dysphoric moods and a blunted affect, with complaints of hallucinations on some occasions" (Tr. 25).  (*See* Tr. 465 & 467-68 (noting, as of December 29, 2015, that Plaintiff had an anxious mood, phobia (an extreme fear of being in a crowded place that caused an impairment in the social and occupational areas of functioning), flat affect, delusions, auditory hallucinations, distractible/inattentive memory or concentration, and "unorganized speech in which he [was] unable to focus on any one topic"); Tr. 457 (noting, as of January 22, 2016, that Plaintiff had

28

a labile mood, blunted affect, poor insight and judgment, hallucinations, delusions, potential for suicide, homicide, or violence, and a GAF score of 20-30); Tr. 500 (noting, as of August 11, 2017, that Plaintiff had a dysphoric mood, blunted affect, auditory hallucinations at night, and potential for suicide, homicide, or violence); Tr. 499 (noting, as of March 7, 2018, that Plaintiff had a dysphoric mood, blunted affect, intermittent hallucinations at night, and no energy to do anything); Tr. 498 (noting, as of July 14, 2018, that Plaintiff had a dysphoric mood, blunted affect, intermittent auditory hallucinations, and potential for suicide, homicide, or violence); *see also* Tr. 458 ("Client is convinced that there are cameras and tape recorders in the air vents of his home.  He recently fell through the ceiling when he got in the attic to look for the cameras.  Client reports having auditory hallucinations, [and] reports that the voices do not tell him to do anything bad, but they are very annoying."); *but see* Tr. 454 (noting that Plaintiff was "[m]uch improved" as of February 19, 2016).)  To the extent there was improvement in Plaintiff's symptoms, it did not seem to have a noticeable effect on his functioning, as his isolation continued, and his hallucinations persisted.  Also, contrary to the ALJ's findings, the treating records seem to be consistent with other substantial medical evidence of record, including the reports of the consultative examiners.

Even if the Court were to accept the ALJ's evaluation of the treating

and examining source opinions as supported by substantial evidence, it is questionable whether the ALJ's evaluation of the State Agency non-examining consultants' opinions would stand.  First, when Dr. Miranda-DeCollibus and Dr. Ragsdale issued their opinions on May 31, 2016 and October 10, 2016, respectively, they did so without the benefit of reviewing and considering Dr. Larson's subsequent treatment records and opinions.

Further, although the ALJ "essentially adopted the[] overall assessment[s]" of Dr. Miranda-DeCollibus and Dr. Ragsdale (Tr. 24), the ALJ seemed to discount, without explanation, Dr. Ragsdale's limitation to jobs with two-to-three-step oral instructions (Tr. 123) and Dr. Miranda-DeCollibus's limitation to work with supportive, communicative supervisors and caring support staff (Tr. 81).  As stated in SSR 85-15, the basic, mental demands of competitive, unskilled work include the ability to respond appropriately to supervision, coworkers, and usual work situations on a sustained basis.  Responding appropriately to others includes the ability to: (1) accept instructions and respond appropriately to criticism from supervisors; and (2) get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes.  POMS DI 25020.010.  "A substantial loss of ability to meet any of the[] basic work-related activities would severely limit the potential occupational base," which, "in turn would justify a finding of disability because even favorable age, education, or work

experience will not offset such a severely limited occupational base." SSR 85-15.

Based on the foregoing, the Court does not find that the ALJ's RFC assessment is supported by substantial evidence. Therefore, this case will be reversed and remanded with instructions to the ALJ to reconsider the opinions of all treating, examining, and non-examining sources, explain what weight they are being accorded, and the reasons therefor.

Accordingly, it is **ORDERED**:

1.    The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order, pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, and conduct any further proceedings deemed appropriate.

2.    The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.    In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012). This Order does not extend the time limits for filing a

motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

  **DONE AND ORDERED** in Jacksonville, Florida, on March 29, 2021.

         MONTE C. RICHARDSON
       UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record